BALL et al. v. RANDERSON.

RANDERSON v. BALL et al.

(District Court, D. Rhode Island. September 16, 1901.)

No. 1,081.

1. TOWAGE—CONSTRUCTION OF CONTRACT—DAMAGES FOR BREACH.
    Libelant agreed to perform towing services in connection with dredging operations at a stipulated price per day. There was no agreement that the tug should work for any particular length of time or while any particular amount of dredging was being done. *Held*, that there was no implied agreement that the tug should be always in readiness, or always able to work, which would render her liable for damages resulting to respondent because of her failure to be in attendance at all times.

2. DAMAGES—BREACH OF TOWAGE CONTRACT—EVIDENCE.
    A claim for damages against a tug, under contract to perform towing services for a dredging fleet, because of her occasional absence or unreadiness, can only be sustained by proof of actual damage resulting. In the absence of such proof, evidence of the earning capacity of the dredging plant per day, when fully employed, affords no basis for charging the tug with damages computed at the same rate for time lost by her.

In Admiralty. Suit to recover for towage services and cross libel for damages.

Matteson & Healy, for libelants.

Worthington Frothingham and Adoniram J. Cushing, for respondent.

BROWN, District Judge. The libelants, Fenner Ball and others, owners of the steam tug Alma, seek to recover from John P. Randerson a balance claimed for services performed by the tug in towing the dredge Empire State and her scows in dredging operations at Block Island in this district. The cross libel of Randerson is for damages for an alleged breach of contract, for negligence in crushing a small boat, and to recover the value of coal and water furnished by Randerson for use by the tug in connection with the dredging operations, but used by the tug for her own purposes.

Though the original libel of the owners of the tug was simply for services rendered from July 23 to November 8, 1900, the pleadings

and evidence require a consideration of the relations of the parties from an earlier period. I find, as a matter of fact, that the tug, which was new and untried, began work for the dredge upon the 9th day of April, 1900; that no previous contract had been made for her services, which began without any agreement as to their duration or as to the rate of payment, the efficiency of the tug at that time not having been tested. Randerson testified, on this subject, that he told the agent of the tug "to try it and see what he could do." I find, also, that according to the preponderance of evidence the tug continued to perform services for the dredge until about July 21, 1900, before the parties arrived at any express agreement as to the price to be paid. During this time, the tug was furnished with coal and water by the owner of the dredge. The tug having rendered valuable services without any express contract, I find an implied contract to make payment for the value of the services during this period. Upon the whole evidence I am of the opinion that a fair price for the tug's services is the sum of $25 per day for working days and $12.50 a day for lay days. It appears that the tug did work in towing the barges and dredge on 86 days, and lay idle, but in readiness to work, on 2 lay days, during this period. It appears, however, that during these 86 working days the tug was either incapacitated by accident or absent through delays or upon business of her own for periods of time amounting in all to 6 days, 5 hours, and 10 minutes. The tug claims full compensation at the rate of $25 per day for each day when the tug performed any services, irrespective of any delay, absence, or incapacity upon her part during the remainder of the day. This claim is obviously untenable, and inconsistent with the position that she is entitled to the reasonable value of the services rendered. I find the tug entitled to payment at the rate of $25 per day for 79 days, 4 hours, and 5 minutes, and at the rate of $12.50 per day for 2 days, amounting in all to the sum of $2,012.92, for services rendered between April 9 and July 21, 1900.

It is agreed that at some later day an agreement was made whereby the tug should furnish her own coal and receive a fixed price per day. There is no evidence, however, that this agreement was for any specified period of time. Either party was at liberty to terminate the contract at will. The date of this contract, the rate of payment, and the terms of the contract are all in dispute. The libelant contends that the date was July 23d; the libelee, that it was August 4th. The libelee concedes that this makes practically little difference, since the new rate claimed by the libelants—$30 per day, finding her own coal and water—differed but little from the rate of $25 per day, with coal and water furnished. While the evidence is, perhaps, not entirely satisfactory as to the exact day, I am of the opinion that, according to the preponderance of evidence, it was on or about July 23d that the tug began work under the new arrangement. Ball states that the agreed rate was $30 per day for working days and $15 a day for lay days. Randerson testifies that it was to be at that rate, but only on condition that Ball should arrange to furnish him with water at the rate of $75 per month; otherwise, it was to be at the rate of $28 per day. He testifies that he was obliged to pay $90 per

month for water, and therefore claims that he should pay but $28 per day. Ball denies expressly that the contract included any agreement as to water, and there would seem to have been no reasonable theory upon which Ball would have accepted a reduction of $2 a day on the price of his boat for a difference of $15 per month in the price of water, even were we to consider the suggestion of counsel that Ball himself had the practical monopoly of the water supply. I find that the agreement for the price of the boat was definite at the rate of $30 per day, and not conditional upon the price of the water. I find that the tug Alma and the tug Harriet, which was supplied and accepted in her place during a portion of the time, worked 80 days, 8 hours, and 25 minutes at the rate of $30 per day, and that the libelants are entitled to receive therefor the sum of $2,425.25, and that there were 12 lay days for which they are entitled, at the rate of $15 a day, to the sum of $180. The total earnings of the tug were as follows: For services from April 9 to July 21, 1900, inclusive, $2,-012.92; for services from July 23 to November 8, 1900, $2,605.25,— total, $4,618.17. I find, also, that Randerson has paid on account the sum of $3,189.34, leaving an unpaid balance of $1,428.83. Randerson is entitled to deduct for coal and water consumed by the tug for her own purposes the amount of $57.58, leaving a balance due the owners of the Alma of $1,371.25.

There remain to be considered the claims set up in the cross libel for damages for breach of contract and for the loss of a small boat, which latter claim I disallow for insufficiency of proof. The claim for damages for failure upon the part of the tug to attend upon the scows must also be disallowed. I find that no agreement was made that the tug should work for any particular period of time; that the contract was terminable at the will of either party; that she did not agree to perform services for any particular amount of dredging; nor was there any guaranty or agreement, express or implied, that the tug should be in constant attendance and always able to work. The contract was simply for certain towing, etc., to be performed by her by the day, and that the tug should receive a stated price per day. Counsel for Randerson lay stress upon the allegation of the libel that the tug was employed in order to enable said Randerson and his said dredge and scows to prosecute the work and finish the contract upon which Randerson was then engaged; but the libelants cannot be held upon this allegation alone, even if, fairly interpreted, it amounts to anything more than a mere statement of Randerson's purpose in employing the tug by the day. Ball was in no sense a subcontractor for this work, and there is no evidence on the part of Randerson to show that Ball was employed to finish a particular job. But, even should we have found evidence of a contract by Ball to supply the tug for the whole period of Randerson's contract with the United States, or for any part of it, the claim for damages would yet fail for the reason that there is no proof in this case whereon any finding of the amount of actual damage could be based. The method whereby it is sought to compute these damages is wholly fallacious. There is no proof of any actual damage, or of the amount of any actual expenses incurred, or of any actual profits lost, by reason of any delays. The evidence

is merely to the effect that the plant was a $45,000 plant; that it had an earning capacity of so much per hour when employed upon certain government contracts. There is no evidence whatever that Randerson lost other employment through the delay, or that there was any substantial damage suffered. The absurdity of attempting to compute damages in this way is shown by an examination of the account appended to the cross libel. For a single day's absence the tug, which was to receive $30 a day, is charged $300 damages for the day; for an absence of 1 hour and 20 minutes, she is charged damages to the amount of $33.32; and for an absence of 20 minutes is charged $8.32. From the close account made by the inspector of the absences of the tug, even for periods of 10 minutes, it appears that she was fairly diligent in her attendance, and that the work was performed in a reasonably satisfactory manner, rather than that the tug was continuously damaging the owner of the dredge to very large amounts during the entire period from April to November. As the tug could have been discharged at any day when her services had proved unsatisfactory or a detriment to the dredge, it cannot be assumed, without direct proof, that there was any substantial damage.

The owners of the Alma are entitled to a decree for the sum of $1,371.25, and for their costs. The only substantial matter set up in the cross libel being such as could have been set up in the answer, the cross libel is dismissed, with costs to the owners of the Alma.